**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-255

LAURA SAXTON and
DOUG SCHELLING, as the surviving parent of Kelsie Schelling, decedent.

Plaintiffs,

v.

DONTHE LUCAS,
SARA LUCAS,
VIVIAN LUCAS,
DAWN SHAY LUCAS,
DETECTIVE NEAL ROBINSON, in his individual capacity,
SERGEANT KEN ESPINOZA, in his individual capacity,
DEPUTY POLICE CHIEF ANDREW McLACHLAN, in his individual capacity, and
CITY OF PUEBLO, COLORADO,

Defendants.

---

## COMPLAINT FOR DAMAGES AND JURY DEMAND

---

Plaintiffs, above-named, by and through its counsel, Lonn M. Heymann of Lonn Heymann Law Firm, P.C., for their Complaint for Damages and Jury Demand hereby allege as follows:

### INTRODUCTION

1.     This is a civil rights action for damages resulting from the deprivation of civil rights under color of law. Kelsie Schelling's parents, Laura Saxton and Doug Schelling (herein referred to collectively as "Plaintiffs"), seek damages, declaratory, and injunctive relief to remedy the deprivation of their right of access to courts by the City of Pueblo, Colorado, Detective Neal Robinson, Sergeant Ken Espinoza, and Deputy Police

1

Chief Andrew McLachlan (herein referred to collectively as "Pueblo Police Department Defendants"). Plaintiff's also state a claim for wrongful death against Donthe Lucas, Sara Lucas, Vivian Lucas, and Dawn Shay Lucas (herein referred to collectively as "Lucas Defendants").

2.     Plaintiffs seek relief for the Pueblo Police Department Defendants' deliberate interference with their right to file a wrongful death lawsuit in Colorado District Court, pursuant to Colorado Wrongful Death Act, C.R.S. § 13-21-201, et seq., by refusing to open and investigate a criminal case arising from the death and disappearance of Kelsie Schelling on or about February 5, 2013, in Pueblo, Colorado, by tampering with or destroying evidence material to any wrongful death claim, by deliberately disregarding compelling leads and evidence pointing to the homicide of Kelsie Schelling by Donthe Lucas, with whom Kelsie Schelling had driven from Denver to Pueblo to discuss her pregnancy with his child.

## JURISDICTION AND VENUE

3.     This action arises under the Constitution of the United States and 42 U.S.C. § 1983 and the Colorado Wrongful Death Act, C.R.S. § 13-21-201, et seq. Jurisdiction is proper pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

4.     Venue is proper in the United States District Court for the District of Colorado because the incidents and resultant injuries to Plaintiffs giving rise to this action occurred in the State of Colorado.

## PARTIES AND OTHER ACTORS

5.      Laura Saxton is the surviving mother of Kelsie Schelling. Doug Schelling is the surviving father of Kelsie Schelling. They have standing per Colorado Wrongful Death Act, C.R.S. § 13-21-201(1) as this complaint is filed after one year following the death of Kelsie Schelling, who died without a spouse, heirs, or designated beneficiaries.

6.      Each Lucas Defendant is a resident of the City of Pueblo, Colorado, and is named as a defendant in this complaint pursuant to the Colorado Wrongful Death Act, C.R.S. § 13-21-201, et seq., as they are the persons who would have been liable, if Kelsie Schelling's death had not ensued.

7.      Detective Neal Robinson, Sergeant Ken Espinoza, and Chief Deputy Police Chief Andrew McLachlan are employees of the Pueblo Police Department and were acting within the course and scope of their employment. They are sued in their individual capacity, although some of their actions can be attributed to the City of Pueblo insofar as they were acting in their official capacity. Each is a "person" per 42 U.S.C. § 1983.

8.      The City of Pueblo is a home-rule city in the County of Pueblo, Colorado, which includes the Pueblo Police Department. The City of Pueblo is a "person" per 42 U.S.C. § 1983.

## FACTUAL BACKGROUND

9.      Kelsie Schelling (herein "Kelsie") was feloniously killed on or about February 5, 2013 by Donthe Lucas. The Lucas Defendants conspired with or acted as an accomplice in the homicide.

10.    Kelsie's disappearance occurred after she was "coaxed" into traveling to Pueblo Colorado on February 4, 2013 by Donthe Lucas (Father of Kelsie's child) and his mother Sara Lucas. Kelsie attended  medical appointment in Denver during the morning hours of February 4 and confirmed that she was two months pregnant with Donthe Lucas's child. Communications between Kelsie, Donthe and Sara Lucas via text messages and phones calls indicates that Donthe and Sara sent a plethora of messages trying to convince Kelsie to travel to Pueblo before attending her Doctors appointment. Kelsie however elected to wait and attended the medical appointment and confirmed she was in fact pregnant before traveling to meet with Donthe and his mother. After the Doctor's appointment Kelsie returned to work and finished the work-day before traveling to the Pueblo Colorado area.

11.    At 11:20p.m. on the evening of February 4, 2013, Kelsie arrived at the Wal-Mart at 4080 West Northern, Pueblo, Colorado to meet Donthe as directed by him. Donthe was not at Wal-Mart and kept stalling for time through text messages before directing her to another unknown location. At 12:32 a.m., in the early morning hours of February 5, 2013 Kelsie sent Donthe a text message wanting to know where he was at, complaining that she had been waiting for over an hour for him. That was the last confirmed message that will indicate that Kelsie was alive. At 3:54 a.m. Donthe calls Kelsie's cell phone. According to cellular tower pings and triangulation, Donthe and Kelsie's cell phones where in a very close proximity of each other and concluded that Donthe had no reason to call the Kelsie's phone. The theory is that Kelsie had been

murdered before this call was made and that the call was made to Kelsie's phone to locate the phone in the dark.

12. Throughout the rest of the night various text messages were communicated between Kelsie's cell phone and Donthe's cell phone. An analysis of text verbiage from Kelsie's phone after the 3:54A.M. time period, would indicate that the messages where not being typed by Kelsie and the wording, spelling and type of verbiage used was not close to the traditional verbiage used in previous messages. The content of the messages made no sense and were out of context.

13. At 11:39 a.m., on February 5, 2013, Donthe Lucas travels to Canon National Bank in Pueblo, driving Kelsie's 2011 Black Chevrolet Cruze and withdraws $400.00 cash from the ATM with Kelsie's ATM card. Surveillance video clearly shows that that Donthe Lucas is driving the car and that Kelsie is not present.

14. Donthe Lucas is then observed by surveillance video parking Kelsie's car at the Wal-Mart parking lot, located at 4080 West Northern Avenue in Pueblo. Donthe exits the car and walks to the rear of the store where he was picked up by his mother, Sara Lucas, and grandmother, Vivian Lucas. For the next 18 hours, Kelsie's car sits in the same parked position. No one else exits the car or enters the car until February 6, 2013 at 7:20 a.m. when an African-American male walks directly to the car from the same walking path that Donthe Lucas takes to leave the car from the rear of the store. That male was accompanied in another vehicle by Dawn Shay Lucas who acted as a lookout.

15.     Immediately following the evident criminal conduct toward Kelsie Schelling, her family, Plaintiffs, filed a missing person's report and sought the assistance of law enforcement, including the Pueblo Police Department, and the media.

16.     As of February 5, 2015, there is no record listed within the Pueblo Police Departments online records data-base that Kelsie Schelling's disappearance has ever been logged as an open investigation assigned with a Pueblo Police Department case number. There has never been a Pueblo Police Department Case File Number identified to Kelsie's family or to the Investigators that the family has privately hired.

17.     The Pueblo Police failed to retrieve evidence from the Denver Police Department to be submitted to the Colorado Crime Laboratory to obtain DNA classification required to be submitted into a National data-base.  Over a year later, these items were not processed for DNA.

18.     In August of 2013, Laura Saxton learned from an independent source that Kelsie's DNA needed to be listed in the National CODIS. Kelsie's family, learning of this process themselves, took the necessary steps to obtain a DNA profile personally to be submitted to CODIS themselves. To this date, there is no proof that Kelsie's exact DNA was ever obtained from her hairbrush and toothbrush.

19.     On April 29, 2013, during the first privately held press conference by Kelsie's family and the media in Pueblo, unknown by Kelsie's family and the media, Detectives from Pueblo Police Department traveled to the residence of Donthe and Sara

Lucas to advise them that a press conference was being held regarding Kelsie and that Donthe needed to go and defend himself to the media and family.

20.     Knowing that Donthe Lucas had been identified as a person of interest in Kelsie's disappearance, this was a deliberate act by law enforcement to assist the suspect and undermine the purpose of the media event to help find Kelsie.

21.     On February 14, 2013 the Pueblo Police Department located Kelsie's vehicle at St. Mary Corwin Hospital abandoned. The vehicle was locked and appeared to have been sitting at that location for several days. Surveillance footage was obtained from the Hospital and it was determined that Kelsie's vehicle was parked at the location on February 7, 2013. The footage shows a subject parking the vehicle and then walking from the parking lot in a westerly direction. Pueblo Police Department refused to send the surveillance video to the FBI for enhancement.

22.     The Pueblo Police Department conducted a crime scene search upon the vehicle and processed the vehicle for evidence. Detective Robinson stated to Laura Saxton and her family that "the car was wiped clean, no evidence was recovered". This statement was repeated several times over the next few months to members of Kelsie's family as well as to the independent investigators that Laura Saxton hired privately to investigate Kelsie's disappearance.

23.     After reviewing the crime scene photos of Kelsie's car, independent investigators began to question the processing procedures of the Pueblo Police Department as the family's investigator was able to identify several items of evidence

within the photographs taken by the Police Department. Kelsie's family indicated that Kelsie maintained her vehicles appearance was always in a pristine condition completely opposite of the vehicles condition when recovered. A request was made to allow the family's investigator to re-process Kelsie's car.

24.     The approval was granted, however on January 22, 2014, investigators John Slater and Fred Cheek were requested to meet with Detective Robinson, without the presence of Kelsie's family, at the Pueblo Police Department. On this date, Detective Robinson confessed that he had lied to Kelsie's family about evidence found in Kelsie's car. Detective Neal Robinson stated that they indeed recovered a substance from the trunk of the car that is consistent with dried bodily fluids and had also recovered two large palm prints off the front seat head rests of Kelsie's car. There was no excuse offered as to why the Pueblo Police Department lied concerning evidence collected, stating "the car was wiped clean, no evidence was collected".

25.     Robinson stated that the evidence was currently being stored in the Police Departments evidence room and had never been submitted for testing with the crime lab. Although investigator John Slater requested that the evidence be submitted to the crime lab immediately, this evidence has, on information and belief, never been submitted for analysis with the crime laboratory. This is a deliberate attempt to conceal or destroy physical evidence.

26.     Future communication with Detective Robinson revealed that the "evidence did not return anything."

27.     Requests were also made by the family's investigator for soil samples that are contained within Kelsie's vehicle. These requests began in February of 2013 and finally alleged samples were taken in October of 2013. To this date, no written report over the testing or submission of the evidence has been reported.

28.     On January 22, 2014, investigators John Slater and Fred Cheek processed Kelsie's vehicle at the Pueblo Police Department's impound storage. While processing the vehicle, it was learned that the PPD and FBI allegedly processed the vehicle a total of three times with no evidence being recovered.

29.     During this fourth process by John Slater and Fred Cheek, they recovered three fingerprints from the driver's side visor mirror. They identified undercarriage damage on the passenger side of the vehicle and obtained what appeared to be a human hair from the damaged area. They also obtained samples of a hard yellowish substance that appeared in several locations about the front of the vehicle.

30.     This evidence was collected in the presence of Detective Robinson so a chain of custody could be provided for evidentiary procedures. Detective Robinson was asked to submit the evidence to the CBI crime lab for processing and analysis, which he refused to do, nor would the Pueblo Police Department take possession of the recovered evidence for storage and custody requirements regarding Kelsie's disappearance. Although the evidence was recovered in the Detective presence and was missed by his agency he enhanced their position by stating that if the evidence was going to be

analyzed, it would need to be done with a private laboratory at the expense of Kelsie's family.

31.     While processing Kelsie's vehicle and engaging the vehicles onboard navigational system, it was determined that the back-track feature of the system was engaged to record the last few travel paths of the vehicle. This was brought to the attention of Detective Robinson with a request to have the data extracted from the system for backup and to log the travel paths of the vehicle.

32.     Investigator Slater conducted a marked degree of study regarding the onboard navigational system and the On-Star feature of the vehicle. Slater has provided to Detective Robinson by his request, a written warrant affidavit for General Motors and On-Star with proper scientific verbiage related to the tracking processes as described by On-Star in the patent application held within the United States Department of Commerce which describes how and when tracking information is obtained by On-Star.

33.     To this date, the Pueblo Police Department has not requested this information by utilizing the proper verbiage and description of the processes. However, Detective Robinson has stated that he would get this information numerous times since January 22, 2014 and has not done so.

34.     The Pueblo Police Department did not properly process Kelsie's vehicle and submit evidence for analysis. Notwithstanding the above information, soil samples and dust sample analysis were allegedly obtained, however as of this date, written analysis findings have never been obtained.

35.     Certain surveillance recordings were obtained from Wal-Mart, where Kelsie's car was parked after she became missing by admission of Donthe Lucas. Video surveillance was obtained for the dates of February 4, 5 and 6 of 2013. The surveillance video clearly identifies Donthe Lucas as parking Kelsie's car on February 5, 2013 and Donthe being picked up by his mother at the rear of the store a few minutes later. Kelsie does not appear in this video at any point as Donthe describes to Police. Kelsie's car does not move from that location at any time during the overnight hours until an unknown African American appears from the rear of the store during the early morning hours of February 6th, 2013 and approaches Kelsie's car. The video imagery is not clear enough to identify the subject.

36.     The Pueblo Police Department previously stated that the video was submitted to a professional for video enhancement. This process dragged out for several months and was finally obtained with little to no improvement. The property records of the images were obtained and learned that the "Professional" was a member of a local, outside Law Enforcement Agency and that the software that was utilized was "Photoshop". There was no enhancement of the imagery.

37.     As the subject approaches the vehicle, it is determined that the individual uses the remote lock on the key to unlock the doors. This is determined through video enhancement conducted by Investigators hired by the Saxton family. Kelsie's records with General Motors shows that her vehicle's keys are computer coded and that only two keys were ever activated in the vehicles history. The second key was located in Kelsie's

apartment several days later thus proving that Donthe Lucas (1) is the unknown subject that returns and moves Kelsie's vehicle to the hospital or (2) that Donthe Lucas provided the suspect with the key to Kelsie's car to move the vehicle. As the unconfirmed subject approaches Kelsie's vehicle, the headlights begin to flash as the remote is being pushed.

38.     Upon receiving the "Enhanced Imagery" from the Pueblo Police Department and determining facts by their own enhancement, the family requested that the Pueblo Police Department submit the original video to the Federal Bureau of Investigations Crime Laboratory for expert enhancement. The request was denied and the submission was never made.

39.     At this point, Investigators for the Saxton-Schelling family purchased enhancement software in an attempt to gain evidence from the surveillance video that was released to the investigators. Evidence was obtained through enhancement to prove that Donthe Lucas is involved in Kelsie's disappearance and the removal of Kelsie's vehicle from the Wal-Mart parking lot.

40.     After repeated requests to obtain all video surveillance from the Detective Robinson for connecting frames of video views, Detective Robinson released a mixture of video's including all three dates of the before and after video footage that was being requested however, the requested footage was not present. Certain views that would have been part of the total three-day media package were missing. The views that were missing would clearly identify the suspect removing Kelsie's vehicle and a secondary vehicle that assisted the suspect.

41.     When Detective Robinson was questioned over this, he aggressively stated that this is all he has, "there is no more video!!"

42.     The Saxton-Schelling family has done a lot of organizing among Pueblo citizens and friends to help find Kelsie.

43.     On May 31, 2014, search team member Stephanie Jiron received a tip about an individual that had been night fishing on Lake Minnequa within the Pueblo City limits. It was reported that this individual, fishing with his girlfriend on the East side of the lake snagged something large and heavy with his fishing pole. Thinking he was hooked on a large branch or log, he entered the water and followed the line to the snag. As he found the snag, he lifted the object up until he saw what appeared to be a human upper head and torso. He stated that he saw hair attached to the head however he dropped it immediately and cut his fishing line. He and his girlfriend then left the area and debated on contacting Law Enforcement due to his association to gang activity. In speaking with a family friend that has been associated with the searching for Kelsie, this friend advised him that he needed to report the incident because the body may be that of Kelsie.

44.     This individual traveled with the friend to the Pueblo Police Department and met with Detective Neal Robinson and gave a statement of the events that happened. He then traveled with Detective Robinson to the lake and advised him of the exact location of where the body was located.

45.     John Slater contacted Detective Robinson to ask about the tip and to determine his intentions. He advised Slater that the tip was credible and he had

summoned the Police Departments dive team and made the request for the team to search

the lake. As the weeks went by, Slater questioned Detective Robinson to see if they

searched the lake and the response was always "No, I need to get them to do that". To

this date, the lake has not been searched after an individual identified a deceased person

as being at the bottom of the lake. This is a deliberate act of not investigating a possible

criminal act or lead to recover human remains that could possibly be Kelsie or that of

another individual.

46.     The Pueblo Police Department seized the cell phone of Donthe Lucas

during one of two brief interviews conducted with the suspect. The cell phone is

password protected and the suspect will not release the password information. The

Saxton's investigator has provided information and contacts to Detective Robinson on

numerous occasions for Experts who are able to bypass the password in a sterile

environment to meet evidentiary requirements, however, Detective Robinson has made

no attempt to access this phone.

47.     Information has been provided from engineering experts to detail cellular

triangulation of Donthe Lucas and Kelsie Schelling's cell phones that would pin point

within a few feet of the phones locations when text messages and calls were made during

the events that led up to Kelsie's disappearance, and after, until Kelsie's phone was

turned off. This process is conducted at no cost to the Law Enforcement Agency from

cellular engineers experienced in missing person's cases. In comparison of the engineers

product compared to what the Pueblo Police Department presented this service would

narrow down distances of miles to a matter of a few feet. Again. This offer was not followed up on or requested by the Pueblo Police Department.

48.     In July of 2014, a letter was sent to the District Attorney's Office in Pueblo Colorado, requesting a response to several questions posed by Kelsie's family. The main question was that in response to Detective Robinsons statements that the District Attorney would not file murder charges without Kelsie's body being found nor would they convene a Grand Jury to present evidence to. Detective Robinson stated that the District Attorney's Office would not entertain information about Kelsie's case.

49.     In a letter to the District Attorney's Office, a retired former U.S. Attorney was identified who offered to assist the Pueblo Police Department and the District Attorney's Office with investigating and prosecuting specialized "No Body" cases at no cost to either agency. According to this expert, he was not contacted by either agency after being briefed by the family investigators. The District Attorney's Office responded stating that the office would entertain prosecuting the suspect in Kelsie's disappearance however NO evidence had been presented by the Pueblo Police Department. According to Detective Robinson, questions from the DA's Office were being posed to his bosses and they were obviously becoming agitated over it. Detective Robinson stated to Mr. Slater that they were going to go ahead and submit the case file by the end of the week to file murder charges against Donthe Lucas. As of this date and time, this has not been completed.

50.     During the course of the family's investigation, problems with the Pueblo Police Department began almost immediately. Detective Robinson and other members of the department engaged Kelsie's family with hostility, lies and a tactic of intimidation that has uncovered deliberate attempts of destroying evidence, mishandling evidence, failure to investigate leads, divulging of confidential information to suspects, suspects family and individuals that have no direct link to the investigation. The Pueblo Police Department limited direct contact with Kelsie's family to one day a week at a specific time of day. There has been zero contact with Kelsie's mother, Laura Saxton since March of 2014. She has emailed and texted Detective Neal Robinson of the Pueblo Police Department numerous times over the last few months and has not received one response.

51.     Detective Robinson stated to Investigator Slater that he knew that Laura Saxton had been seeking counseling and that he had a friend that worked as a counselor in the same office that Laura Saxton was seeking counseling with. Detective Robinson went beyond the normal scope of his duties inquiring at a personal level to obtain confidential information about Laura Saxton's statements during the sessions regarding complaints about himself and the Police Department. Detective Robinson would then share this information with other officers and people not associated to the case and treat Laura Saxton with hostility based on her confidential conversations with her counselor. The conversations between Detective Robinson and Slater were audio recorded.

52.     Since February 14, 2013, The Pueblo Police Department has conducted one interview with Donthe Lucas. This second interview was attempted when he was

charged for utilizing Kelsie's debit card without permission which was later dismissed by the District Attorney. After proving to Detective Robinson that Donthe took Kelsie's car key when he parked her vehicle at Wal-Mart and that the suspect that moved the car the next day had the same key, we requested that Detective Robinson attempt to interview Donthe Lucas again, which he will not do. In light of this, we have made numerous requests that Kelsie's case be turned over to the Colorado State Police and/ or the Federal Bureau of Investigation.

53.     Evidence has been overlooked, disposed of and leads have not been followed up on. The evidence uncovered to date suggests that members of the Pueblo Police Department, under the color of law, have deliberately failed to protect the rights of Kelsie Schelling's family by deliberately obstructing the investigation into the disappearance and death of Kelsie Schelling and her unborn child.

54.     Detectives with the Pueblo Police Department have intentionally lied and falsified information about evidence recovered and has intentionally withheld DNA and trace evidence from being submitted for analysis participating in a conspiracy against the civil rights of Kelsie Schelling's family. Members of the Pueblo Police Department under the color of law have deliberately caused the delay of crucial evidence to be collected and submitted for analysis as they have divulged information to the suspects in an attempt to protect them from prosecution and deliberately obstruct the Investigation and criminal prosecution of the persons responsible for the disappearance and presumed murder of Kelsie and her unborn child.

55. Plaintiffs suffered economic injuries caused by the Lucases. They seek compensation for the expense of a funeral and the cost of investigating and seeking the assistance of law enforcement. Plaintiffs also seek non-economic damages against the Lucases, including emotional distress, mental anguish, bereavement, and sorrow, and including the lost companionship with their daughter. Plaintiffs reserve the right to seek solatium damages, however they intend to establish the causation of Kelsie's death by the Lucases under willful and wanton circumstances. Plaintiffs seek economic damages against the Pueblo Police Department Defendants, including the expense of a multi-year effort to encourage, support, and facilitate the investigation of Kelsie's death. The treatment of Plaintiffs, particularly Kelsie's mother Laura Saxton, cause emotional distress and outrage.

**FIRST CLAIM FOR RELIEF**
**Felonious Wrongful Death of Kelsie Schelling**
**(*Against Donthe Lucas, Sara Lucas, Vivian Lucas and Dawn Shay Lucas*)**

56. Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding Paragraphs 1 through 55 of this Complaint.

57. Kelsie Schelling was feloniously killed when Donthe Lucas committed first-degree murder, second-degree murder, or manslaughter against Kelsie and Sara Lucas and   Lucas acted as co-conspirators or accomplices during or after the killing.

58. The Lucas Defendants each engaged in wrongful conduct that would have entitled Kelsie Schelling to maintain an action, had she survived, against the Lucas Defendants.

59.     Kelsie Schelling death was caused by the wrongful acts, neglect, or default of Donthe Lucas and the civil conspiracy the remaining Lucas Defendants with Donthe Lucas.

60.     The Lucas Defendants acted in a willful and wanton manner.

61.     Plaintiffs seek damages as stated in paragraph 55 above.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 Denial of Access to Courts Violation**
***(Against each individual Pueblo Defendant)***

62.     Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding Paragraphs 1 through 61 of this Complaint.

63.     Plaintiffs' right to access to courts, supported by several provisions of the Constitution including the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause, the First Amendment, and the Privileges and Immunities Clause of Article IV, were violated by the individual Pueblo Police Department Defendants.

64.     The individual Pueblo Police Department Defendants each acted under color of law as Pueblo Police Department employees acting within the course and scope of their employment.

65.     The individual Pueblo Police Department Defendant's intentional and bad-faith conduct burdened Plaintiffs' ability to pursue a civil action in state court against the parties responsible for the death of Kelsie Schelling.

66.     Evidence gathered from decedent's car, relevant to a wrongful death claim against the Lucas Defendants, was concealed or destroyed.

67.     The Pueblo Police Department Defendants refused to follow leads and gather evidence at two locations where Kelsie's body might have been found.

68.     Defendants refused to interview key witnesses and refused to pursue relevant data.

69.     Defendants relied on the statements of Donthe Lucas although he was shown to be incredibility.

70.     Plaintiffs seek damages as stated in paragraph 55 above, as well as injunctive and declaratory relief.

## THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 Deprivation of Right to Access to Courts - Monell Claim
### *(Against the City of Pueblo, Colorado)*

71.     Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding Paragraphs 1 through 70 of this Complaint.

72.     A policy, custom or practice of the Pueblo Police Department caused denial of Plaintiffs' access to courts by deliberately interfering with Plaintiffs' ability to file a felonious wrongful death case against the Lucas Defendants.

73.     A final decision-maker, Deputy Chief of Police McLachlan, the police acted to deprive Plaintiffs their right of access to courts by determining the Pueblo Police Department policy that a case has not been opened regarding the disappearance and homicide of Kelsey Schelling and that Donthe Lucas has not been identified as a person

of interest and, accordingly, ignored the roles of the other Lucas Defendants in the killing of Kelsie Schelling.

74.     Defendant City of Pueblo's policies, practices or procedures impeded or obstructed a criminal investigation into the murder of Kelsie Schelling for the purpose of frustrating Plaintiffs' right to access to courts, as discussed above.

75.     Plaintiffs seek damages as stated in paragraph 55 above, as well as injunctive and declaratory relief.

**WHEREFORE**, Plaintiff respectfully prays that this Court enter judgment in its favor and against the Defendants for damages, as referenced above in paragraph 55, for injunctive and declaratory relief as appropriate, costs, expert witness fees, and reasonable attorney fees as allowed by statute or as otherwise allowed by law, and for any other and further relief that this Court shall deem just and proper.

**PLAINTIFF DEMANDS TRIAL TO
A JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 5th day of February, 2015.

LONN HEYMANN LAW FIRM, P.C.

*s/__Lonn M. Heymann_____*
Lonn M. Heymann
Lonn Heymann Law Firm, P.C.
P.O. Box 200818
Denver, CO 80220
Phone: (303) 825-9100
Lonn@HeymannLegal.com